1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   W.L. Gore & Associates, Inc.,           )   No. CV-10-8088-PHX-GMS
                                             )
10        Plaintiff and Counterdefendant,    )   **ORDER**
                                             )
11   vs.                                     )
                                             )
12                                           )
     GI Dynamics, Inc.,                      )
13                                           )
          Defendant and Counterclaimant.     )
14                                           )
     _____)
15

16          Pending before the Court is the Motion to Dismiss of Defendant/Counterclaimant GI

17   Dynamics, Inc., ("GID") Counts X and XI of the Complaint of Plaintiff/Counterdefendant

18   W.L. Gore & Associates, Inc., ("Gore") (Doc. 14), and Gore's Motion to Dismiss Counts

19   II–VII and X of GID's Counterclaims. (Doc. 29). For the following reasons, the Court denies

20   in part and grants in part Defendant's motion, and denies in part and grants in part Plaintiff's

21   motion.

22                                    **BACKGROUND**

23          The Complaint and Counterclaim generally allege the following. (Doc. 3, 19). The

24   dispute between Gore and GID stems from their efforts to develop an intestinal sleeve device

25   that is anchored in the gastro-intestinal tract and would have beneficial effects on patients

26   suffering from morbid obesity and/or Type II diabetes. Gore's Medical Division is in the

27   business of developing, manufacturing and marketing a variety of implantable medical

28   devices incorporating expanded polytetrafluoroethylene (ePTFE). GID is a medical device

company developing proprietary devices and methods for the treatment of obesity and diabetes using stomach and intestinal sleeves.

The parties' relationship began around December 2002, when the president of GID's predecessor company initiated discussions with Gore regarding developing materials for GID's intestinal sleeve device. On January 6, 2003, prior to entering into substantive discussions, the parties signed a confidential disclosure agreement ("2003 CDA"). On January 15, 2004, the parties executed a second confidential disclosure agreement ("2004 CDA").[1] On that same date, the parties also entered into a Technology Assessment and Material Transfer Agreement ("MTA"), whereby Gore agreed to provide samples of its small porosity, high bubble point ePTFE tubes to GID for evaluation through *in vitro* and animal studies.[2]  The MTA also contemplated a long-term supply agreement, pending successful completion of certain milestones. Several months later, in October 2004, GID and Gore entered into a Supply Agreement, still in effect,  which provides that Gore would supply GID with its requirements of small porosity, high bubble point ePTFE tubes on a non-exclusive basis during the term of the agreement.[3] In addition to buying the ePTFE tubes from Gore, GID agreed to make milestone payments and to pay royalties in connection with sales of products manufactured from the tubes.

By early 2009, Gore began to indicate to GID that it had a different view regarding the interpretation of certain provisions of the 2003 CDA, 2004 CDA, and the MTA. While Gore asserts that it has the right to make, use, and sell material disclosed under the CDA or MTA to any party in any form for any use, including completed intestinal sleeve devices, GID asserts that Gore's rights are subject to GID's patents; i.e., Gore does not have a right

---

[1] Both CDAs provide that they are to be construed under the laws of Delaware.

[2] The MTA provides that the validity and interpretation of the agreement are to be governed by the laws of Arizona.

[3] The Supply Agreement provides that it shall be governed by and construed under the laws of Massachusetts and the United States.

1    to make intestinal sleeve devices covered by GID's patents. GID has asserted its

2    unwillingness to license Gore to produce an implant similar to GID's own device. As a result,

3    the parties have a fundamental dispute regarding their respective rights and obligations under

4    the three agreements. The more specific allegations asserted by each side are recited below.

5

6                                        **DISCUSSION**

     **I.    Legal Standard**

7           **A.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

8           To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil

9    Procedure 12(b)(6), a complaint must contain more than "labels and conclusions" or a

10   "formulaic recitation of the elements of a cause of action"; it must contain factual allegations

11   sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,

12   550 U.S. 544, 555 (2007). While "a complaint need not contain detailed factual allegations

13   . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'"

14   *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*,

15   550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content

16   that allows the court to draw the reasonable inference that the defendant is liable for the

17   misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550

18   U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a

19   defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent

20   with' a defendant's liability, it 'stops short of the line between possibility and plausibility of

21   entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

22          When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll

23   allegations of material fact are taken as true and construed in the light most favorable to the

24   nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal

25   conclusions couched as factual allegations are not given a presumption of truthfulness, and

26   "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a

27   motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

28   / / /

1    **II.      Analysis**

2            **A.      GID's Motion to Dismiss**

3                    **1.      Plaintiff's Complaint**

4            The Complaint filed by Gore  alleges that under the three agreements between the

5    parties, and consistent with its general practice and policies, Gore preserved its right to

6    proceed with device manufacture on its own without interference from GID. (Doc. 3).

7    According to Gore's Complaint, it was fundamental to the long-term Supply Agreement that

8    the two parties were "mutually enabling each other to develop and produce intestinal sleeve

9    devices – Gore by providing GID with the critical component it required to proceed with its

10   development, and GID by providing Gore with the freedom to operate irrespective of GID's

11   intellectual property." (¶ 36). As such, over the course of its collaboration with GID, Gore's

12   Complaint alleges that Gore redesigned and reformulated the composition and structure of

13   the sleeve materials on its own initiative, without any specific instructions from GID

14   personnel. Even more, Gore claims to have invested substantially in developing and

15   finalizing the design of its own prototype intestinal device and has reached a point where it

16   must make even more substantial investments to proceed with commercialization.

17   Nonetheless, GID has refused to grant Gore a covenant not to sue, either generally or in

18   connection with any particular device, and has continued to assert that it will enforce its

19   patents against Gore.

20           Gore further asserts that its material was critical enabling technology for GID's

21   intestinal devices. "[I]t was only through Gore's contribution that an overall device suitable

22   for its ultimate intended purpose was ultimately conceived." (¶ 49). Nevertheless, Gore

23   alleges, GID failed to include Gore personnel as co-inventors in some of its GID-assigned

24   patents and patent applications. Gore contends that it is a co-inventor in every claim of GID's

25   patents and patent applications comprised of the Gore material.

26           Plaintiff raises the following claims in its Complaint: (1) correction of inventorship;

27   (2) breach of the 2003 and 2004 CDAs ; (3) declaratory judgment of Gore's rights under the

28   2003 and 2004 CDAs; (4) anticipatory breach of 2003 and 2004 CDAs; (5) breach of the

MTA; (6) declaratory judgement of rights and obligations under the MTA; (7) anticipatory breach of MTA; (8) breach of MTA's implied duty of good faith and fair dealing; (9) quiet title; (10) declaratory judgment that the Supply Agreement is void *ab initio*; and (11) declaratory judgment of noninfringement and invalidity. GID seeks dismissal of Counts X and XI.

### 2.    Count X: Declaratory Judgment that Supply Agreement is Void *Ab Initio*

Gore argues that the Supply Agreement should be declared void *ab initio* because "the parties had a fundamentally different view of their rights under their previously-entered agreements, and, as a result, there was no mutual assent to material terms of the Supply Agreement (which by its terms and the terms of the MTA was a continuation of the MTA)." (Doc. 3). GID contends that Gore's differing views about earlier agreements is not a basis for declaring the later Supply Agreement void. (Doc. 14).

Formation of a binding contract requires the parties to express objectively or to manifest mutual assent to the material and essential terms of their agreement. *Nortek, Inc. v. Liberty Mut. Ins. Co.*, 843 N.E.2d 706, 714 (Mass. App. Ct. 2006); RESTATEMENT (SECOND) OF CONTRACTS § 17 cmt. c (1981). A contract may be held to be nonexistent for failure of mutual assent if the parties attach conflicting and irreconcilable meanings to a material term of the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS, §§ 20, 152 cmt. a ("Relief is only appropriate in situations where a mistake of both parties has such a material effect on the agreed exchange of performances as to upset the very basis for the contract."); *Samuels v. Brooks*, 519 N.E.2d 605, 609 (Mass. App. Ct. 1988). Massachusetts courts have expressed a reluctance to declare an agreement a nullity because of the parties' disagreement over the interpretation of a provision unless that provision went to the heart of the agreement. *See Samuels*, 519 N.E.2d at 609; *Shawmut-Canton v. Great Spring Waters of Am., Inc.*, 816 N.E.2d 545, 550–51 (Mass. App. Ct. 2004) ("[A] party cannot avoid a contract merely because the parties are mistaken as to an assumption, even though significant, on which the contract was made." (citing RESTATEMENT (SECOND) OF CONTRACTS § 152, cmt. c)).

Further, when determining the effect of a written contract, Massachusetts has adopted the position of the Restatement with respect to evidence of prior agreements and negotiations. RESTATEMENT (SECOND) OF CONTRACTS § 214. Evidence of contract negotiations and the circumstances of its execution are always admissible to show whether the contract was intended by the parties as an integrated (i.e. final) expression of the terms of their agreement or to show the existence of any uncertainties in the contract's application. *Id.*; *Fred S. James & Co. of New England, Inc. v. Hoffman*, 507 N.E.2d 269, 271 (Mass. App. Ct. 1987).

Gore alleges that as a result of GID's evaluation of the performance of Gore's ePTFE tubes, and as contemplated by the MTA, the parties entered the long-term Supply Agreement. (Doc. 3, ¶ 33). The Agreement requires Gore to supply GID's demands for "small porosity, high bubble point ePTFE tubes" on a nonexclusive basis, and requires GID to purchase all of its requirements from Gore until August 31, 2014. (*Id.* at ¶ 20, 33, 34).

Gore alleges, however, that the two parties were operating under different assumptions with respect to a material fact underpinning the Supply Agreement, namely whether Gore had the absolute right to manufacture and sell intestinal sleeve devices without any assertion of intellectual property rights by GID. (*Id.* at ¶ 106). Gore alleges that it understood ¶ 8 of the MTA, which survives the Supply Agreement, as granting Gore the right to make, use and sell any material disclosed under the MTA to any party in any form for any use, including sleeves as incorporated in completed intestinal sleeve devices. (*Id.* at ¶ 55). GID, on the other hand, asserts that Gore does not have a right to make intestinal sleeve devices covered by GID's patents. (*Id.*).

While this Count implicates the validity of the Supply Agreement, Gore's argument is premised on an underlying dispute regarding the earlier MTA. However, assuming that the Supply Agreement "refers back to the MTA," (Doc. 3, ¶ 105), it is plausible that the validity of the Supply Agreement could be affected by the meaning and implications of the earlier

MTA, which survives the Supply Agreement.[4] To that end, the extrinsic facts concerning the contemporaneous understandings of the parties as to the terms of the MTA could conceivably demonstrate the failure of the parties to agree on a material and essential term of that contract, as permitted by Massachusetts law. *See Fred S. James*, 507 N.E.2d at 271. Therefore, it is plausible that the Supply Agreement could be held void for failure of mutual assent if the MTA is deemed sufficiently intertwined with the Supply Agreement so as to constitute a material term of the Supply Agreement, and if further inquiry demonstrates that the parties attached conflicting and irreconcilable meanings to that material term.

Plaintiff has pled enough facts to state a claim to relief. Additionally, the fact that the MTA is also the subject of several of Plaintiff's claims and at least one of Defendant's Counterclaims, none of which are the subject of either party's motions to dismiss, makes a determination of whether there was a meeting of the minds particularly premature at this stage. Defendant's motion to dismiss is denied with respect to this claim.

### 3.      Count XI: Noninfringement and Invalidity

A court has subject matter jurisdiction over a declaratory judgment claim where the claimant shows that the claim satisfies the case or controversy clause of Article III of the Constitution. 28 U.S.C. § 2201(a) (the Declaratory Judgment Act ("DJA") provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (the "actual controversy" requirement in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937))). The claimant bears the burden of

---

[4] Paragraph 21 of the Supply Agreement reads:

<u>Entire Agreement</u>. Except for the previously entered "Technology Assessment and Material Transfer Agreement" [MTA] dated January 15, 200[4], which shall continue to apply according to its terms, this Agreement constitutes the entire agreement between Gore and GI Dynamics relating to the subject matter hereof."

1    establishing declaratory judgment jurisdiction. *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495

2    F.3d 1340, 1344–45 (Fed. Cir. 2007).[5]

3         In determining whether a plaintiff's pleading is sufficient for the purposes of the

4    DJA, courts consider "whether the facts alleged, under all the circumstances, show that there

5    is a substantial controversy, between parties having adverse legal interests, of sufficient

6    immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 549

7    U.S. at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

8    *MedImmune* emphasized that Article III requires the dispute to be "'definite and concrete,

9    touching the legal relations of parties having adverse legal interests'; and that it be 'real and

10   substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as

11   distinguished from an opinion advising what the law would be upon a hypothetical state of

12   facts.'" *Id.*

13        Plaintiff seeks declaratory judgment by alleging the existence of a justiciable

14   controversy between the parties regarding infringement and validity. Specifically, Gore seeks

15   declaratory judgment that its intestinal sleeve product does not infringe upon any of GID's

16   patents and that many of those patents are invalid for a variety of reasons. (Doc. 3, ¶ 111).

17   Plaintiff's allegation is premised on the following facts: 1) "Gore has completed the design

18   of its products and is making and testing those products," 2) "many of the validity issues are

19   inextricably intertwined with the inventorship, ownership and other issues in the case," and

20   3) "Gore has reached the point where it would incur substantial expenses in conducting

21   bench, animal and clinical testing." (Doc. 3, ¶ 110). GID, on the other hand, contends that

22   Gore's allegation is non-justiciable because it seeks declaratory judgment of non-

23   infringement as to a device that is still in early development. (Doc. 14).

24        In assessing immediacy, courts look to the length of time likely to elapse between the

25   filing of the declaratory judgment action and the actual infringement, as well as any

26

27        [5] Federal Circuit law governs determination as to whether an actual controversy exists
under the DJA when the underlying merits of an action involve patent infringement and/or
28   validity. *Minn. Mining & Mfg. Co. v. Norton Co.,* 929 F.2d 670, 672 (Fed. Cir. 1991).

meaningful preparation for making or using a potentially infringing product. *See Cat Tech LLC v. Tubemaster, Inc.*, 528 F.3d 871, 881 (Fed. Cir. 2008) ("[T]he greater the length of time before potentially infringing activity is expected to occur, the more likely the case lacks the requisite immediacy." (quoting *Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1379 (Fed. Cir. 2004))). Gore argues that the present controversy satisfies the immediacy prong of *MedImmune* because "Gore has reached a point where it would incur substantial expenses in conducting bench, animal and clinical testing." (Doc. 3, ¶ 110). However, in light of Plaintiff's own allegations that "[p]rior to being introduced for commercial sale, Gore's medical devices undergo rigorous and intensive laboratory testing, *in vitro* and *in vivo* studies, and clinical trials," and that "[t]ypically, a product may undergo *many years* of testing and clinical trials . . . before being ready for commercial sale," it remains uncertain when, if ever, the declaratory plaintiff would engage in potentially infringing activity. (*Id*. at ¶ 9) (emphasis added).  While Plaintiff contends that it "has completed the design of its products," it has not yet submitted them for approval by the Food and Drug Administration ("FDA"), which suggests, consistent with its own factual allegations, that it has yet to initiate the "many years" of testing and clinical trials required prior to commercialization. (*Id*. at ¶ 10 ("Federal regulations also require Gore and other medical device producers to file applications with the FDA, submitting evidence of the devices' safety and efficacy prior to conducting clinical trials")).

That Plaintiff has reached a point where it would "incur substantial expenses" by embarking on bench, animal, and clinical testing is also insufficient to satisfy the immediacy requirement where the potentially infringing activity could still be "many years" away. *See Benitec Austl.*, 495 F.3d at 1346–50 (affirming dismissal of declaratory judgment Counterclaim where party who sought declaratory relief had not yet filed a new drug application ("NDA") with the FDA and its current activities consisted entirely of developing and submitting preliminary information to the FDA); *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed. Cir. 1992) (affirming dismissal of defibrillator component manufacturer's claim for future patent infringement where clinical trials of the

accused product had just begun and it was "years away" from potential FDA approval). Such an economic interest alone cannot form the basis of an actual controversy under the DJA. *Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 942 (Fed. Cir. 2006) (citing *Aralac, Inc. v. Hat Corp. of Am.*, 166 F.2d 286, 295 (3d Cir. 1948)). Thus, Gore has not met its burden of establishing immediacy.

The present dispute also fails to meet *MedImmune*'s "reality" requirement. In the context of patent litigation, the reality requirement is often related to the extent to which the technology in question is "substantially fixed" as opposed to "fluid and indeterminate" at the time declaratory relief is sought. *See Cat Tech,* 528 F.3d at 882 (quoting *Sierra*, 363 F.3d at 1379). While Gore alleges that it has "completed the design of its products" (Doc. 3, ¶ 110), the facts, as alleged by Plaintiff, also make clear that Gore has yet to file for FDA approval and to begin clinical trials. As such, it seems uncertain that Gore's intestinal sleeve device, as it existed at the time Plaintiff filed its Complaint, will be the same device after FDA approval and years of testing. *See Telectronics*, 982 F.2d at 1525–27 (affirming dismissal of declaratory judgment action where clinical trials of the device had just begun and "[t]here was no certainty that the device when approved [by the FDA] would be the same device that began clinical trials"). Given the potential for significant variability in Gore's medical device as it undergoes the regulatory approval process and vigorous testing, the Court cannot assume jurisdiction for the purposes of issuing a purely advisory opinion likely to be detached from eventual reality, and thus in violation of Article III's case or controversy requirement. *See Sierra*, 363 F.3d at 1378–80 (finding that the plaintiff must establish that the product presented to the court is the same product which will be produced if a declaration of noninfringement is obtained).

*MedImmune* requires "a substantial controversy between parties having adverse legal interests." 549 U.S. at 127. Gore has not met its burden of showing that it is engaged in any present activity that could subject it to a legally cognizable claim of infringement by GID. Gore's present activities would be protected from any potential infringement claims by GID because activities directed to developing and submitting information to the FDA are exempt

1    from infringement under 35 U.S.C. § 271(e)(1).[6] This safe harbor provision applies to

2    medical devices. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661 (1990). Where there is no

3    actual controversy, as is the case here, the Court cannot exercise its discretionary authority.

4    *Cat Tech,* 528 F.3d. at 883 (quoting *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634

5    (Fed. Cir. 1991), *abrogated on other grounds by* Liquid Dynamics Corp. v. Vaughan Co.,

6    355 F.3d 1361, 1370 (Fed. Cir. 2004)).

7         Having considered the totality of the circumstances, the Court finds that Gore has not

8    shown an actual controversy of sufficient immediacy and reality to support declaratory

9    judgment jurisdiction. Thus, the Court dismisses Count XI of Plaintiff's Complaint for lack

10   of jurisdiction.[7]

11        **B.      Gore's Motion to Dismiss GID's Counterclaims**

12             **1.      Defendant's Counterclaim**

13        Counterclaimant GID alleges that an important feature of GID's current product

14   design is its anchoring mechanism, which has a novel wave-like shape and bi-directional

15   barbs. (Doc. 19).  GID developed the anchor in 2003. Further testing also led to the discovery

16   that the device could be anchored more effectively and work better if placed in the

17   duodenum. As GID made these discoveries and filed patent applications on them, it did not

18   use the Gore materials, but rather utilized a variety of materials from various suppliers. It was

19

20        [6] 35 U.S.C. § 271 (e)(1) states:

21             It shall not be an act of infringement to make, use, offer to sell,
             or sell within the United States . . . a patented invention solely
22             for uses reasonably related to the development and submission
             of information under a Federal law which regulates the
23             manufacture, use, or sale of drugs or veterinary biological
             products.
24

25        [7] Apparently Counsel for Gore, as an attempt to provide a courtesy to the Court,
26   recently phoned chambers and informed Court staff that both parties had stipulated to dismiss
     Gore's Count XI. Nevertheless, because the Court had already arrived at the above
27   conclusions, and because the Court has received no filings in which both parties confirm the
28   dismissal of Count XI, the Court has decided the issue on the motions filed.

1   not until after the MTA was executed in January 2004 that GID implanted a device that

2   included sleeve material by Gore in an animal.

3          The Counterclaim alleges that during the course of their relationship, GID repeatedly

4   gave Gore access to its confidential information, including prototypes.  Before entering into

5   both the MTA and the Supply Agreement, Gore demanded, and received on a strictly

6   confidential basis, a substantial amount of confidential information concerning GID's

7   product design, market studies, financial condition, patent portfolio, and future plans. Gore

8   personnel also visited GID's facility on occasion, where they were supplied with further

9   confidential information. In 2006, Gore conducted a detailed review of GID's patent

10  portfolio in consideration of a possible acquisition of GID. As part of Gore's evaluation, GID

11  provided Gore with a sample of its completed product, which was never returned. After

12  claiming that GID's portfolio was not sufficiently valuable, Gore declined to acquire the

13  company.

14         In connection with negotiating the Supply Agreement, and at other times, GID alleges

15  that Gore stated that it would not develop a device directly competitive with GID's.

16  Nevertheless, beginning on April 13, 2007, and without informing GID, Gore filed a series

17  of new patent applications that copied essential aspects of GID's inventions, from the

18  unusual wave-shaped anchor to the placement of the device, both of which it learned from

19  GID. Gore filed patent applications on the same inventions that GID had already developed

20  but kept them a secret until October 2008, when they were published by the patent office.

21         GID alleges that Gore has misappropriated its intellectual property and know-how by

22  attempting to patent GID's inventions and by exploiting its minor role as GID's materials

23  supplier to gain control over GID's inventions. According to GID, Gore's Complaint is

24  "simply a shakedown attempt by a company that wants to get for free something it previously

25  refused to pay for, while casting a shadow over GI Dynamics's inventions, patents, and

26  future business plans." (¶ 5). GID's inventions are claimed in ten issued U.S. patents and

27  twenty pending non-provisional U.S. patent applications, along with numerous foreign

28  patents and applications. GID asserts that its personnel fully conceived of and made the sole

inventive contributions to these inventions.

Defendant/Counterclaimant raises the following counterclaims: (1) declaration of noninventorship; (2) misappropriation of trade secrets; (3) breach of confidence; (4) breach of the CDAs; (5) unjust enrichment; (6) violation of Massachusetts General Laws c. 93A; (7) misrepresentation; (8) declaration of rights under the CDA; (9) declaration of rights under the MTA; and (10) declaration of exceptional case. Plaintiff/Counterdefendant challenges Counts II–VII, and X in their motion to dismiss.

### 2.    Count II: Misappropriation of Trade Secrets

Gore seeks to dismiss the misappropriation of trade secrets counterclaim because GID placed the allegedly misappropriated information regarding the design of the device in the public domain through its published patents and patent applications and because none of the other information mentioned in the Counterclaim is identified with sufficient particularity. (Doc. 35).  The Counterclaim asserts that in addition to its product design and prototypes, the numerous presentations made to Gore by GID contained information about GID's research, development, market opportunities, specific manufacturing methods, financial information, and approach to fighting obesity and diabetes, all of which constitute trade secrets. (Doc. 19, ¶¶ 30, 31, 33, 46).

According to the Uniform Trade Secrets Act ("UTSA"),[8] a "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique or process" that "[d]erives independent economic value . . . from not being generally known to" or readily ascertainable, and whose owner has made reasonable efforts to maintain its

---

[8] Neither party definitively identifies which state's law applies to the misappropriation claim. When the law varies between states, as it does, this failure alone makes it difficult to evaluate, let alone, grant a motion to dismiss. Gore bases its argument on the laws of both Massachusetts and Arizona. In addition to the law of these two states, GID also cites Delaware law. Both Arizona and Delaware have adopted versions of the UTSA. However, Massachusetts has not. Apparently, should a claim be stated under the law of any of these states whose laws might be applicable according to the parties, the motion to dismiss should be denied.

secrecy. *See* A.R.S. § 44-401(4) (2010); 6 Del. C. §2001. "[A] trade secret is not simply information as to single or ephemeral business events. Rather, a trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do now know of or use it." *Enter. Leasing Co. of Phx. v. Ehmke*, 197 Ariz. 144, 148, 3 P.3d 1064, 1068 (Ct. App. 1999) (internal citations omitted).

Counterclaimant has pled with sufficient particularity items and information which may qualify as trade secrets. Specifically, GID has alleged that the "numerous presentations" it made to Gore at Gore's request contained and constituted trade secrets. (Doc. 19, ¶ 46). These presentations included information about GID's "research, development, and market opportunities" as well as "specific financial information." (*Id.*). In addition, GID alleges that information disclosed about its "specific manufacturing methods and prototypes," "approaches that were successful and approaches that were not successful in fighting obesity and diabetes," "product design . . . patent portfolio, and future plans" are also trade secrets. (*Id.* at ¶¶ 30, 46). Counterdefendant's efforts to dismiss the misappropriation claim on grounds that all of the specified information regarding GID's design of its intestinal sleeve device had been published in patents and patent applications is an issue of material fact to be determined by the factfinder. Further, GID's theory that Gore misappropriated its trade secrets prior to the publication of GID's patents or patent applications remains plausible. (Doc. 35). However, even if discovery demonstrates that Gore did not begin work on its own device until after GID's product design information was published, GID has pled facts sufficient for a claim of misappropriation based on the non-design trade secrets, such as the market studies, financial information, manufacturing methods, and GID's future plans, which were not published in the patent applications. GID has also alleged with sufficient particularity its efforts to protect and maintain the secrecy of its trade secrets, including two confidential disclosure agreements with Gore, and expressly marking all of its presentations as "confidential." (Doc. 19, ¶¶ 47, 30 ("GI Dynamics supplied the requested information on a strictly confidential basis. All presentations made to Gore were expressly marked

1    "CONFIDENTIAL.")).

2         Finally, Gore seeks dismissal of the claim because "[w]hat is missing is any allegation

3    of fact that Gore actually misused confidential, protectable 'trade secrets.'" (Doc. 40).

4    Counterclaimant has alleged that Gore misappropriated its trade secrets by "us[ing] improper

5    means, in breach of its express confidentiality obligations to GI Dynamics, to acquire and use

6    the trade secrets." (Doc. 19, ¶ 48).  Specifically, GID alleges that at the time it made contact

7    with Gore "[i]n or after December 2002", "Gore had no previous experience or involvement

8    in non-surgical approaches to obesity and diabetes." (*Id*. at ¶¶ 17,18). However, since that

9    time, Gore has received a substantial amount of confidential information from GID through

10   presentations, facility visits, and discussions of a potential acquisition. (*Id*. at ¶ 30, 31, 33).

11   Subsequently, "[b]eginning on April 13, 2007, and without informing GI Dynamics, Gore

12   filed a series of new patent applications that copied essential aspects of [GID's] inventions,

13   from the unusual wave-shaped anchor . . . to the placement of the device in the duodenum,

14   both of which it had learned from GI Dynamics." (*Id*. at ¶¶ 34, 38 ("Gore's attempt to patent

15   GI Dynamics's inventions was the first prong of its strategy to misappropriate GI Dynamics's

16   intellectual property and know-how.")).  GID also alleges that at some point after December

17   2008, Gore disclosed its intention "to enter the obesity and diabetes markets with a device

18   very similar to GI Dynamics's implant." (*Id*. at ¶ 39).

19        In accordance with *Iqbal*, the aforementioned "factual content" pled by GID "allows

20   the court to draw the reasonable inference"  that Gore may be liable for the misappropriation

21   as defined under the UTSA. 129 S.Ct. at 1949; *see* A.R.S. § 44-401(2)(b), 6 Del. C. §2001.[9]

22   GID has pled enough facts to state a claim to relief for misappropriation of trade secrets that

23   is plausible on its face, and thus the Court denies the motion to dismiss as to this issue.

24

25        [9] As defined under the UTSA, misappropriation means "disclosure or use of a trade

26   secret of another without express or implied consent by a person who either (i) used improper
     means to acquire knowledge of the trade secret, or (ii) at the time of disclosure or use, knew

27   or had reason to know that his or her knowledge of the trade secret . . .was  acquired under

28   circumstances giving rise to a duty to maintain its secrecy or limit its use."

### 3.      Count III: Breach of Confidence

The Counterclaim alleges that Gore received confidential information from GID, owed GID a duty of confidentiality by virtue of the parties' agreements and Gore's role as a materials supplier, and subsequently breached that duty by wrongfully appropriating the confidential information, thereby injuring GID. (Doc. 19, ¶¶ 50–53). The sole reason Counterdefendant offers for dismissal of this Count is that it "rests upon the same set of facts" as GID's misappropriation of trade secrets claim, and is "therefore deficient for the reasons set forth above with respect to Count II." (Doc. 29). Counterdefendant offers no additional arguments as to why this claim should be dismissed. In light of the fact that the Court did not find GID's factual allegations with respect to their misappropriation of trade secrets claim to be deficient (*see* discussion *supra* section II.B.2), GID's breach of confidence claim survives this motion to dismiss.

### 4.      Count IV: Breach of CDAs

The Counterclaim alleges that Gore breached the CDAs by using confidential information disclosed by GID to launch its own initiative in the field of obesity and diabetes research instead of conducting its own market research, making its own inventions, and accumulating its own know-how. (Doc. 19, ¶ 55).  Such conduct, they claim, "constitutes a breach of express provisions of the CDA as well as a breach of the implied covenant of good faith and fair dealing." (*Id*. at ¶ 56). As with Count III, the sole reason Counterdefendant offers for dismissal of this Count is that it "rests upon the same set of facts" as GID's misappropriation of trade secrets claim, and is "therefore deficient for the reasons set forth above with respect to Count II." (Doc. 29). Again, Counterdefendant offers no additional arguments as to why this claim should be dismissed and because the Court did not find GID's factual allegations with respect to their misappropriation of trade secrets claim deficient, the Court denies the motion to dismiss as to this issue.

### 5.      Count V: Unjust Enrichment

The Counterclaim asserts that Gore has been unjustly enriched by knowingly receiving and appropriating GID's confidential information and know-how for its own

1   benefit without providing compensation or consideration. (Doc. 19, ¶ 58–60). To the extent

2   that Counterdefendant challenges this claim because it rests upon the same set of facts as

3   GID's trade secret Count II, the argument fails.

4          Gore also seeks to dismiss this claim on grounds that both Massachusetts and Arizona

5   law preclude unjust enrichment claims when the subject matter of the claim is covered by a

6   contract. (Doc. 29). Although an unjust enrichment claim is unavailable where there is a

7   contract between the parties, such a claim can provide a remedy when a contract is

8   unenforceable. *Trustmark Ins. Co. v. Bank One, N.A.*, 202 Ariz. 535, 542, 48 P.3d 485, 492

9   (Ct. App. 2002). The Counterclaim appears to plead unjust enrichment as an alternative

10  remedy for recovery not superceded by any of the contracts.  Because Counterclaimant may

11  plead unjust enrichment in the alternative to their breach of contract claim (*see* section

12  II.B.4), the Court denies the motion on this ground.

### 6.      Count VI: Violation of Massachusetts General Laws c. 93A

14         Count VI states that Gore intentionally and willfully violated Massachusetts General

15  Laws Chapter 93A, which prohibits unfair and deceptive acts or practices in the conduct of

16  any trade or commerce. MASS. GEN. LAWS ch. 93A, § 11. Counterdefendant challenges the

17  claim on two grounds: 1)  GID's allegations do not identify any alleged injury, and 2) GID

18  has not alleged a causal nexus between any alleged unfair practice and injury suffered.  (Doc.

19  29). The Counterclaim asserts that GID "has suffered and continues to suffer a loss of money

20  and property as a consequence of Gore's unfair and deceptive acts and practices." (Doc. 19,

21  ¶ 64). Gore, however, asserts that GID's allegation of any monetary injury is "not plausible

22  since Gore is not marketing or commercially selling a product." (Doc. 29). It is plausible,

23  nevertheless, that GID's monetary and property losses could relate to something other than

24  sales of Gore's future competing device. The issue of whether Gore has and continues to

25  suffer the pecuniary and property losses it alleges thus raises a matter of factual inquiry that

26  survives a motion to dismiss.

27         The claim also survives the second prong of Gore's challenge, namely that GID has

28  not sufficiently alleged a causal nexus between any unfair and deceptive acts and the alleged

1   injury.  The Counterclaim asserts that GID's injury is "a consequence of Gore's unfair and

2   deceptive acts and practices," which it describes as:  "Gore knowingly and willfully acted

3   unfairly, in bad faith, and with the desire and intent to damage GI Dynamics, impair GI

4   Dynamics's ability to compete in the capital markets, and/or appropriate GI Dynamics's

5   inventions to itself." (Doc. 10, ¶¶ 62, 64). In its motion to dismiss, Gore recognizes GID's

6   allegations of misappropriation of trade secrets and misrepresentation as "[t]he only acts

7   alleged to be unfair and deceptive in GID's Counterclaims." (Doc. 29).  Even on the basis

8   of those two alleged unfair and deceptive acts alone, both of which survive this motion to

9   dismiss, GID has sufficiently pled a causal nexus between Gore's alleged conduct and injury.

10  Accordingly, Counterdefendant's motion to dismiss is denied with respect to this claim.

11              **7.       Count VII: Misrepresentation**

12          Counterclaimant seems to assert claims for both fraudulent and negligent

13  misrepresentation within this Count. However, because Counterclaimant has not met the

14  heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b), the Court

15  does not construe this as a fraud complaint. FED. R. CIV. P. 9(b) ("[A] party must state with

16  particularity the circumstances constituting fraud or mistake."). Although the circumstances

17  surrounding the fraud must be pled with particularity, "[m]alice, intent, knowledge, and other

18  conditions of a person's mind may be alleged generally." *Id.*  Given that GID may be able

19  to allege fraudulent misrepresentation with particularity, the Court dismisses with leave to

20  amend.

21          To the extent Counterclaimant alleges a negligent misrepresentation claim, it has also

22  failed to plead sufficient facts with particularity. To prevail on a negligent misrepresentation

23  claim, Counterclaimant must establish that Gore, in the course of its business or any other

24  transaction in which it had a pecuniary interest, 1) supplied false information, 2) for GID's

25  guidance in its business transactions, 3) without exercising reasonable care or competence

26  in obtaining or communicating the information, and 4) that GID justifiably relied on that

27  information, 5) causing it to suffer pecuniary loss as a result. RESTATEMENT (SECOND) OF

28  TORTS § 552 (1997) (both Arizona and Massachusetts follow the law of negligent

misrepresentation as set forth in the Restatement).  Further, the Ninth Circuit has recognized that the heightened pleading standard of Rule 9(b) may apply to claims that technically lack fraud as an element when these claims are "grounded" or "sound" in fraud. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).   Under this standard, GID must adequately provide the "who, what, when, where, and how of the misconduct alleged." *See Kearns v. Ford Motor Co.*, 567, F.3d 1120, 1124 (9th Cir. 2009). The Counterclaim states that "in connection with negotiating the Supply Agreement," and "at other times," "Gore's Bruce Steinhaus stated that Gore would not develop a device directly competitive with GI Dynamics's. He also indicated that it would be contrary to Gore's corporate culture and ethics to do so." (Doc. 19, ¶ 32).  Nevertheless, GID alleges, "[b]eginning on April 13, 2007, and without informing GI Dynamics, Gore filed a series of new patent applications that copied essential aspects of [GID's] inventions." (*Id.* at ¶ 34). In light of the fact that GID's negligent misrepresentation claim "sounds" in fraud and is seemingly based on the same set of operative facts underlying the corresponding claim of fraudulent misrepresentation, negligent misrepresentation must also be pled with particularity. GID's allegations do not sufficiently provide the time, place, and date of the alleged misrepresentations. Accordingly, the misrepresentation counterclaim is dismissed with leave to amend.

### 8.    Count X: Declaration of Exceptional Case

Under 35 U.S.C. § 285, the court is authorized to award reasonable attorneys' fees to the prevailing party in "exceptional cases" involving infringement actions. Counterdefendant seeks dismissal of Counterclaimant's request for declaration that the present case is exceptional under 35 U.S.C. § 285 and that it is entitled to an award of reasonable attorneys' fees for failure to plead a cause of action.

A claim for attorneys' fees under § 285 is a separate claim. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999). Determining whether a case is exceptional and thus whether attorneys' fees should be granted under § 285 is a two-step process. *See Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed. Cir. 1999) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc)).

The court must first make a factual determination as to whether the case is "exceptional" and then exercise its discretion in determining whether to award attorneys' fees. *Nilssen v. Osram Sylvania, Inc.*, 528 F.3d 1352, 1357 (Fed. Cir. 2008). "In determining whether to award attorney fees, the Court must weigh factors such as degree of culpability, closeness of the questions, and litigation behavior." *Id.* GID has adequately pled its § 285 claim at this early stage where there is a pending inventorship claim, and where it is plausible that the circumstances of the case will be deemed "exceptional" for the purposes of § 285.

However, until the "prevailing party" is known, a party cannot bring a motion for such fees. *Brasseler*, 182 F.3d. at 892. If GID prevails in the parties' dispute with respect to the inventorship of GID's patents, its § 285 claim must be processed in compliance with Rule 54(d)(2)(B).[10] *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1386 (Fed. Cir. 2005) (no provision in section 285 exempts request for attorneys' fees from compliance with Rule 54(d)(2)(B)); *see also* LRCiv 54.2(b). Accordingly, Gore's motion to dismiss Count X is denied.

### CONCLUSION

Defendant's Motion to Dismiss is denied with respect to Count X, and granted with respect to Count XI for lack of jurisdiction. Gore's Motion to Dismiss is denied with respect to Counts II-VI and X, and granted with leave to amend with respect to Count VII.

The Court "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). The Ninth Circuit has characterized this as a standard of "extreme liberality." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) (internal quotation marks omitted). Accordingly, given that GID may be able to allege fraudulent and negligent misrepresentation with particularity, the Court grants leave to amend with respect to Count VII of GID's Counterclaims.

---

[10] Federal Rule of Civil Procedure 54(d)(2)(B) relates to the timing and contents of a motion for attorney's fees. The rule states, in part, that "[u]nless a statute or a court order provides otherwise, the motion must: (1) be filed no later than 14 days after the entry of judgment."

1      **IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (Doc. 14) is

2   **DENIED IN PART** and **GRANTED IN PART**.

3      **IT IS FURTHER ORDERED** that Counterdefendant's Motion to Dismiss (Doc. 29)

4   is **DENIED IN PART** and **GRANTED IN PART**.

5      **IT IS FURTHER ORDERED** that Counterclaimant may file an Amended

6   Counterclaim **within 30 days** of the date of this Order.

7      DATED this 15th day of December, 2010.

8

9   _____

        G. Murray Snow
10        United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28