**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| W. L. Gore & Associates, Inc., | ) | No. CV-10-8088-PCT-GMS |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| GI Dynamics, Inc., | ) | |
| | ) | |
| Defendant/Counter-Claimant. | ) | |
| | ) | |

Pending before the Court is a Motion for Summary Judgment on Defendant/Counter-Claimant GI Dynamics, Inc.'s ("GID") Counterclaims filed by Plaintiff/Counter-Defendant W. L. Gore & Associates, Inc. ("Gore"). (Doc. 119). For the reasons stated below, the motion is granted in part and denied in part.

**BACKGROUND**

Gore's Medical Division is in the business of developing, manufacturing and marketing a variety of implantable medical devices incorporating expanded polytetrafluorothylene (ePTFE). GID is a medical device company that develops proprietary devices and methods for treatment of obesity and diabetes using stomach and intestinal sleeves. This dispute between Gore and GID stems from their efforts to develop an intestinal sleeve device anchored in the gastro-intestinal tract that would treat patients suffering from morbid obesity and/or Type II diabetes.

The parties' relationship began around December of 2002, when the president of GID's predecessor company initiated discussions with Gore regarding developing materials for its intestinal sleeve device. In 2003 and 2004, the parties entered a number of agreements, including two Confidential Disclosure Agreements ("2003 CDA" and "2004 CDA"), a Material Transfer Agreement ("MTA"), and a Supply Agreement. During the course of the parties' relationship, GID kept Gore informed on the status of the development of its sleeve. This included a slideshow demonstrating to Gore how the sleeve would be inserted and anchored. (Doc. 123-9, Ex. 74).

In 2005, representatives from the two companies met to discuss Gore's possible acquisition of GID. During the discussions, GID presented further information on the development of its sleeve, along with information on clinical trials GID had been conducting. (Doc. 124-1, Ex. 78). After the presentation, GID gave Gore a sleeve and delivery system to examine. (Doc. 124-6, Ex. 100). The acquisition discussions eventually fell through.

In 2006, Gore established its own internal team to begin development of a Gore intestinal sleeve to compete with the GID sleeve. Currently, both products remain in development and await approval for commercial use in the United States. Gore's internal timeline projects a commercial release date in the second quarter of 2016. (Doc. 124-13, Ex. 160). Robert Crane, GID's Chief Financial Officer, estimates that GID's device will be available for commercial release in the United States sometime between 2015 and 2017. (Doc. 123-8, Ex. 64 at 28:8–16).

Much of the dispute in the complaint concerns the various agreements between Gore and GID regarding intellectual property rights relating to the development of the intestinal sleeves. Gore's amended complaint alleges that Gore has a shared interest in the development of the device, and that Gore personnel should be declared co-inventors of various patents filed by GID. (Doc. 65). GID has filed counterclaims alleging that the presentations GID made to Gore contained trade secrets, and that Gore misappropriated those trade secrets in pursuing its own development of an intestinal sleeve. In addition, GID's

1  counterclaim includes claims of Breach of Confidence, Unjust Enrichment,

2  Misrepresentation, and violations of Mass. Gen. Laws Ch. 93A. (Doc. 72).

3       Neither party has moved for summary judgment on the claims in the original

4  complaint, and the Court need not interpret the CDAs, the MTA, or the Supply Agreement

5  in order to resolve this motion. Gore has filed for summary judgment on GID's

6  counterclaims, alleging principally that GID cannot show that it was damaged by Gore's

7  alleged misappropriation. Further, Gore claims that the Arizona Uniform Trade Secret Act,

8  Arizona Revised Statutes ("A.R.S.") §§ 44-401–07, preempts GID's counterclaims for

9  Breach of Confidence, Unjust Enrichment, Misrepresentation, and violations of

10  Massachusetts law. Next, Gore contends that even were the other claims not preempted, they

11  would fail on the merits. Finally, Gore contends that should its motion fail, the Court must

12  nevertheless dismiss misappropriation claims associated with certain trade secrets.

13  **ANALYSIS**

14  **I.    Legal Standard**

15       Summary judgment is appropriate if the evidence, viewed in the light most favorable

16  to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact

17  and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive

18  law determines which facts are material and "[o]nly disputes over facts that might affect the

19  outcome of the suit under the governing law will properly preclude the entry of summary

20  judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] party seeking

21  summary judgment always bears the initial responsibility of informing the district court of

22  the basis for its motion," including identifying portions of the record that demonstrate the

23  absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

24  (1986).

25       Once the moving party has detailed the basis for its motion, the party opposing

26  summary judgment "may not rest upon the mere allegations or denials of [the party's]

27  pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

28  - 3 -

1   FED. R. CIV. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

2   586-87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995);

3   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A fact issue is genuine 'if the evidence

4   is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v.*

5   *Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at

6   248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved

7   only by a finder of fact *because they may reasonably be resolved in favor of either party*.'"

8   *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th

9   Cir. 1987) (quoting *Anderson*, 477 U.S. at 250; emphasis in original). "[A]t the summary

10  judgment stage the judge's function is not himself to weigh the evidence and determine the

11  truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477

12  U.S. at 249.

13      A principal purpose of summary judgment is "to isolate and dispose of factually

14  unsupported claims." *Celotex*, 477 U.S. at 323–24. Summary judgment is appropriate against

15  a party who "fails to make a showing sufficient to establish the existence of an element

16  essential to that party's case, and on which that party will bear the burden of proof at trial."

17  *Id.* at 322; *see Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). The moving

18  party need not disprove matters on which the opponent has the burden of proof at trial.

19  *Celotex*, 477 U.S. at 323.

20  **II. Discussion**

21      Gore contends that GID has not shown that it was proximately damaged by Gore's

22  alleged use of its trade secrets. (Doc. 119 at 5–6). Alternately, it argues that GID has not

23  presented competent evidence that it was damaged at all. (*Id.* at 7–13). Gore next claims that

24  the non-AUTSA claims are pre-empted, and that those claims would fail on the merits in any

25  event. (*Id.* at 14–21). Finally, it argues that even if summary judgment is not merited,

26  individual claims based on particular trade secrets must be dismissed. (*Id.* at 21–27). These

27  issues will be discussed in turn.

28                                    - 4 -

1

### A.      Trade Secrets Claim

2      Arizona has adopted a version of the Uniform Trade Secrets Act ("AUTSA"), under

3   which plaintiffs may recover damages for misappropriation of a trade secret. A.R.S. § 44-

4   401–07. A plaintiff may seek to recover "both the actual loss caused by misappropriation and

5   the unjust enrichment caused by misappropriation that is not taken into account in computing

6   actual loss." A.R.S. § 44-403(A). The statute provides that "[i]n lieu of damages measured

7   by any other methods, the damages caused by misappropriation may be measured by

8   imposition of liability for a reasonable royalty." *Id.* The reasonable royalty theory is derived

9   from patent law, and is "based not on the infringer's profit, but on the royalty to which a

10  willing licensor and a willing licensee would have agreed" at the time of the

11  misappropriation. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)

12  (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1159 (6th Cir.

13  1978). Damages are "an essential element of . . . [a] misappropriation of trade secret . . .

14  claim[]," and a claim fails as a matter of law without a cognizable theory of proximately

15  caused damages. *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1054 n.5 (D. Ariz.

16  2010).

17      "Damages are typically measured by any direct injury which a plaintiff can prove, as

18  well as any lost profits which the plaintiff would have earned but for the infringement."

19  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). Damages that are

20  "speculative, remote or uncertain may not form the basis of a judgment." *Soilworks, LLC v.*

21  *Midwest Inds. Supply, Inc.*, 575 F. Supp. 2d 1118, 1128 (D. Ariz. 2008) (internal quotation

22  omitted) (holding that a claim must fail when a plaintiff "was unable to articulate any facts

23  regarding [an allegedly lost bid] or any other bid or sale allegedly lost as a result of

24  [defendant's] misconduct"). In *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 724 (5th

25  Cir. 2006), the Fifth Circuit dismissed a case where damages claims were predicated upon

26  "speculative revenues and operating profit from an unbuilt plant." The court wrote that

27  damages were speculative because the plaintiff had produced "no evidence of lost profits

28

suffered by [plaintiff], no evidence of actual sales enjoyed by [defendant], no evidence of development costs saved by [defendant], no evidence as to what a reasonably prudent investor would have paid for the alleged trade secrets, and no evidence of a reasonable royalty for the alleged trade secrets." *Id.* at 724–25. The Ninth Circuit has affirmed the exclusion of an expert's damages report, and thereby a grant of summary judgment, when the expert could not "demonstrate his competence or back up his opinion with specific facts." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 806 (9th Cir. 1988).

Gore acknowledges that "certain of the misappropriation issues may be too fact-intensive to address on summary judgment," and bases its challenge to the AUTSA claim on two theories regarding damages, namely: 1) GID has not established harm proximately caused by the alleged misappropriation and 2) GID has not submitted competent evidence justifying damages. (Doc. 119 at 5–7).

### 1.    Proximate Cause

In *Firetrace*, the district court granted summary judgment after a bench trial when it found that the plaintiff had presented no evidence that the misappropriation had caused any damage, even though the plaintiff had demonstrated that all the other elements of a misappropriation claim had been satisfied. 800 F. Supp. 2d at 1054. The court found that while the defendant had breached his confidentiality agreement by sharing information, the defendant "did not use the misappropriated information in developing" a competing product. *Id.* Therefore, although defendant had disclosed a trade secret, neither it nor the entity to which it had disclosed the secret profited from the disclosure. During the trial, a plaintiff's witness had testified that the plaintiff corporation "did not suffer damage from the misappropriation of trade secret liability found by the Court." *Id.*

GID makes no such concession here. Rather, the record contains evidence from which a reasonable jury could conclude that Gore used GID's alleged trade secrets to develop its competing product. The record contains emails regarding a "secret brainstorming meeting" that took place while Gore was considering purchasing GID, and notes from that meeting

1   which describe ideas for a "windsock" in the intestine which is attached by a "stent graft"

2   and is "removable," similar to the GID device. (Doc. 124-9. Ex. 118–121). Gore thus argues

3   that GID has not yet suffered harm because neither company has brought its product to

4   market to date. (Doc. 119 at 6). Gore acknowledges that its theory regarding the lack of

5   proximate cause is "[c]losely related" to its theory regarding the lack of damages. (Doc. 119

6   at 3). In fact, the theories are identical—Gore argues that there was no proximate cause of

7   damage because there was no damage at all. As such, its proximate cause argument succeeds

8   or fails on its generalized damages argument below.

9                    **2.    Damages**

10        Gore divides its damages argument into three sub-parts: it argues that GID cannot rely

11   on a cost-based measure of damages, that GID's research and development ("R & D") costs

12   cannot measure Gore's unjust enrichment, and that GID's reasonable royalty theory is overly

13   speculative. (Doc. 119, 7–10). All of these theories, in some manner, challenge the report

14   submitted by Plaintiff's damages expert, Dr. Keith Ugone. (Doc. 115-2, Ex. 16). For the

15   purposes of clarity, this order will first address the general challenge to Dr. Ugone's report

16   and then the three particular challenges to its methodology.

17                    **a.    Dr. Ugone's Report**

18        Throughout its motion, Gore relies on cases in which courts excluded an expert report

19   on damages, usually on a *Daubert* motion, or in which a jury award was vacated because no

20   competent damages expert had testified at trial. *See*, *e.g.*, *McGlinchy*, 845 F.2d at 806;

21   *Mattel, Inc. v. MGA Entm't, Inc.*, CV-04-9049-DOC, 2011 WL 836418 (C.D. Cal. Mar. 4,

22   2011); *Applied Hydrogel Tech., Inc. v. Raymedica, Inc.*, CV-06-2254, 2008 WL 5500756

23   (S.D. Cal. Oct. 7, 2008). For example, Gore relies on a case in which the Federal Circuit

24   affirmed the district court's grant of a new trial solely on damages when the original award

25   had been based on an expert's testimony that a reasonable royalty could be calculated by the

26   "25 percent rule." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir.

27   2011). In affirming, the Circuit decided that "as a matter of Federal Circuit law that the 25

28

percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation." *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). Gore also relies on a case in which the Federal Circuit found that a jury award was based on "unsupported rationaliziations" rather than competent testimony after it determined that the only witness to testify as to damages "did not qualify as a damages expert." *Wordtech Systems, Inc. v. Integrated Networks*, 609 F.3d 1308, 1321–22 (Fed. Cir. 2010). Despite this line of attack, Gore has not in fact filed a *Daubert* motion asking this court to exclude Dr. Ugone's report, has not argued that he is not competent to testify, and has not otherwise shown that Dr. Ugone's report did not "sufficiently tie the expert testimony on damages to the facts of the case." *Uniloc,* 632 F.3d at 1315 (quoting *Daubert*, 509 U.S. at 591).[1]

Dr. Ugone's report calculates damages premised upon GID's theory that Gore obtained trade secrets while purporting to negotiate the purchase of GID and then used those secrets to develop a competing product. (Doc. 115-2, Ex. 16). According to this theory, Gore, armed with an actual sample of GID's device and clinical studies demonstrating that the device was safe and effective in animals and humans, saved substantial research and development costs when it chose to develop its own device. Dr. Ugone presents three distinct methods of calculating the damages of the alleged misappropriation. He writes first that GID's damages can be measured by "the historical cost-based pre-commercialization measure of the value of the trade secrets." (Doc. 115-2, Ex. 16 at 5). Second, he claims that damages can be measured by "the diminishment of GI Dynamics' expected profits given Gore's misappropriation." (*Id.*) Third, he opines that Gore experienced economic gains because the misappropriation provided it with "the likelihood of accelerated entry into the

---

[1] According to his attached curriculum vitae, Dr. Ugone has testified as a damages expert in at least five trials regarding trade secrets, at least nineteen regarding patent litigation, and at least seven regarding copyright and trade dress. (Doc. 115-2, Ex. 16 at 8–12).

market," and the ability "to choose a more cost efficient development path than it otherwise would have." (*Id.* at 7). Acknowledging that measuring damages under the first or third theory (GID's lost profits or Gore's economic gains) would involve "considerable uncertainty," Dr. Ugone calculated damages using the reasonable royalty approach. (*Id.* at 5).

Dr. Ugone's reasonable royalty calculation is based on facts specific to Gore and GID's dealings, including the valuation of GID at the time of the proposed acquisition, GID's license agreement for other patents, and GID's investment costs. (Doc. 115-2, Ex. 16 at 12). While a reasonable  jury could reject Dr. Ugone's report, and Gore offers many reasons to view it with skepticism, a reasonable jury could also find that Dr. Ugone's methods present a reasonable method for calculating damages. *See Telex Corp. v. Int'l. Bus. Mach. Corp.*, 510 F.2d 894, 931 (10th Cir. 1975) ("In other words, through the use of its trade secrets, Telex was able to market its peripheral units much sooner than if it had waited for the IBM product to be marketed, and then have duplicated it through reverse engineering."). Cases cited by Gore in which no expert testimony was presented, or in which testimonies or reports of a damages expert were excluded based on *Daubert*, are simply not applicable here.

Gore now claims that because neither company has brought a product to market yet, any calculation of damages or enrichment caused by the alleged misappropriation can only be "based on speculation, guesswork, or pure fantasy." (Doc. 119 at 10). There was, and of course remains, a possibility that neither company's product will ultimately be profitable. Although such a possibility should be priced into the 2006 value of the alleged secrets, it does not render those secrets necessarily valueless. A product that would be worth a billion dollars were it to reach the marketplace, but which has only a 20% chance of reaching the marketplace, may still be valued at $200 million by discounting the chance of failure from the present value of a marketable product. *Cf. Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002) ("[I]f the cash flow is risky, the normal procedure is to discount its forecasted (expected) value at a risk-adjusted discount rate. . . . The risk-adjusted

1  rate adjusts for both time and risk." (quoting Richard A. Brealey and Steward C. Myers,

2  *Principals of Corporate Finance*, p. 244 (6th ed. 2000))).

3       In fact, GID and Dr. Ugone include a number of internal Gore documents

4  demonstrating that, as of 2006, Gore itself placed substantial value on the technology, and

5  properly discounted it based on the risk that a product may never reach the market. An

6  internal Gore email written while the parties were discussing a $200 million acquisition price

7  states that, even modeling a 50% chance of the product failing clinical trials, "the only reason

8  I can find why we wouldn't spend $200M and run is we simply do not have the cash." (Doc.

9  124-9, Ex. 113). Gore itself calculated the cost of a one-year delay of bringing an intestinal

10 sleeve to market at $600 million. (Doc. 123-4, Ex. 55). Gore has shown that it is capable of

11 pricing the chance of failure into its projections for its own device: one collection of

12 estimates includes four separate decision trees, each of which discounts a percent loss for

13 failure or delay. (Doc. 123-4, Ex. 55 at WLG0049974). Elsewhere Gore calculated the

14 discounted value of potential adverse outcomes, including "Fail all Markets, After ReWork

15 Mkt1 Only," "Partial Success," and "Fail – Cannot Prove LT Type Diabetes Efficacy." (Doc.

16 123-3, Ex. 48 at WLG00049883). From Gore's sophisticated method for calculating the

17 value of bringing a product to market and Dr. Ugone's report, a reasonable jury could

18 conclude that GID was damaged or Gore was unjustly enriched by the misappropriation of

19 GID's trade secrets.

20            **b.     Individualized Challenges to Damages Calculations**

21       In addition to its general challenge to Dr. Ugone's report on the grounds that

22 calculating damages in this case is overly speculative, Gore presents three particular

23 challenges to his methodology. It claims that 1) the "cost-based" measure of damages cannot

24 be applied because GID did not lose the value of its secrets, 2) GID's R & D costs cannot be

25 used to measure Gore's Unjust Enrichment, and 3) the reasonable royalty theory is unduly

26 speculative because the product has not yet been marketed. (Doc. 119 at 8–10). These

27 arguments will also be addressed in turn.

28

### i.      Cost-Based Measure

Dr. Ugone first measures the alleged loss to GID by claiming that GID lost the value that it had invested in research and development of the secrets when they were misappropriated. (Doc. 115-2, Ex. 16 at 5). At least one district court in this circuit has excluded expert testimony purporting to measure damages by R & D costs, noting that such costs do not bear a necessary relation to the market value of the research once developed. *Applied Hydrogel Tech., Inc. v. Raymedica, Inc.*, CV-06-2254, 2008 WL 5500756, at *2 (S.D. Cal. Oct. 7, 2008) ("[T]he 'cost to create or duplicate' method could generate the same value for a worthless trade secret and a trade secret worth millions of dollars."). In cases where the trade secrets developed by the research have been demonstrated to have actual value, however, courts have measured damages, at least in part, by development costs. *See Telex*, 510 F.2d at 932 (affirming a damages award based on research costs when "the trial court first found that IBM had expended $10,000,000 on the development of the Aspen project . . . and that Gruver and others had left IBM half way through the development program"). The cost to create property has long been considered an appropriate factor in computing damages, so long as the "property . . . is injured or destroyed by the wrongful or negligent act of another." *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 370 (9th Cir. 1947) (emphasis added). As Gore notes, "the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has *in some way* destroyed the value of the secret." *University Computing Co. v. Lykes-Youngstown*, 504 F.2d 518, 535 (5th Cir. 1974) (emphasis added). Using trade secrets to develop a competing product destroys some of the value of the secrets, and thereby can form the basis of a cognizable trade secrets claim. *See Telex*, 510 F.2d at 931.

### ii.      Unjust Enrichment

Gore claims that because GID has withdrawn claims regarding some of the trade secrets, Dr. Ugone's report cannot measure the degree to which Gore was unjustly enriched. (Doc. 119 at 9). In *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d

1   1064 (N.D. Cal. 2005), the Central District of California vacated a jury award based on

2   unjust enrichment because the jury awarded 75% of the damages sought, even though it

3   found that only one of eleven trade secrets had been misappropriated. In *O2*, however, the

4   court found that there was no reasonable basis to conclude that the single trade secret was

5   worth 75% of the damages sought, because the person who testified as to the secret's value

6   was an officer of the company, not an expert damages witness, and the officer had testified

7   to "just his assessment of importance, not a dollar value." *Id.* at 1077. Here, GID has

8   provided an expert report on the value of the trade secrets. Although the report does not

9   break out the particular value of the secrets on a secret-by-secret basis, it does break them

10  into categories, and it does place particular value on Trade Secret 1. (Doc. 115-2, Ex. 16 ¶¶

11  80–84). Again, for purposes of summary judgment, the only question is whether GID has

12  presented evidence from which a jury could determine that Gore profited or GID was

13  damaged by the misappropriation; a jury could draw that conclusion from the analysis

14  contained in Dr. Ugone's report. The precise value of those damages can be determined by

15  the jury.

16  ### iii.   Reasonable Royalty

17          Gore argues that because the products have not yet been marketed, a reasonable

18  royalty calculation is unduly speculative. The Federal Circuit has upheld damages "premised

19  on a lump sum royalty payment based on an infringer's expected sales," even when actual

20  sales did not meet expectations. *Interactive Pictures Corp. v. Infinite Pictures, Corp.*, 274

21  F.3d 1371, 1384 (Fed. Cir. 2001). When damages are based upon a reasonable royalty, the

22  calculation "necessarily involves an element of approximation and uncertainty." *Unisplay,*

23  *S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). As the Supreme Court has

24  noted and the Federal Circuit has confirmed, "[t]he rule which precludes the recovery of

25  uncertain damages [does not apply] to those damages which are definitely attributable to the

26  wrong and only uncertain in respect of their amount." *Linderman Maschinefabrik GmbH v.*

27  *American Hoist & Derrick Co. Harris Press & Shear Div.*, 895 F.2d 1403, 1406 (Fed. Cir.

28

- 12 -

1990) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

Although a plaintiff must therefore provide competent evidence from which a reasonable jury could conclude that it was damaged in order to survive a summary judgment motion, it need not show damages with absolute precision or certainty. The record contains detailed analyses of the value to Gore of entering the market early, from which a jury could conclude that Gore was enriched, even though the process of product development remains underway. (Doc. 123-4, Ex. 55; Doc. 123-3, Ex. 48). Here, *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 668 (E. D. Tex. 2002) is instructive. In *Alcatel*, the court rejected a damages theory based in part on the speed of getting to market, but only because the claimed consequences of getting to market sooner themselves involved fortunate twists of fate. *Id.* The plaintiff had claimed that because a particular product was marketed sooner, it was shown at a particular trade show, where a particular company saw it and thereby decided to purchase the company that manufactured the product. *Id.* The court held that a theory that the misappropriation thereby led to the company's inflated purchase price was simply "too speculative" because a "break or non-occurrence in any of the above chain of events would eviscerate the foundation" of the theory. *Id.* Here, on the other hand, GID's theory of damages does not rely on a series of fortuitous coincidences; future risk was priced into the 2006 value of the secrets. (Doc. 123-4, Ex. 55; Doc. 123-3, Ex. 48). The *Alcatel* court reaffirmed that "[w]here damages are uncertain . . . we do not feel that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown." 239 F. Supp. 2d at 667 (*quoting University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974)).

### c.   Damages Summary

Gore has not challenged Dr. Ugone's report, and in any event the scope and detail of the report is adequate to "sufficiently tie the expert testimony on damages to the facts of the case." *Uniloc,* 632 F.3d at 1315. Although the damages in this case may be imprecise, Dr.

Ugone's report, based in part on internal calculations from Gore itself, provides a cognizable method for reducing that imprecision. Gore has presented a number of challenges to the report, and a future jury may take Gore's arguments into account. Nevertheless, Gore has not shown that Dr. Ugone's theories fail as a matter of law, or that there are no genuine issues of material fact regarding damages. Summary judgment on the trade secrets claim is denied.

### B.    Other Claims

Gore argues that the other claims must fail for a number of reasons. First, it claims that GID cannot rely on a reasonable royalty calculation for claims that do not provide statutory authorization for such a calculation. Second, it argues that the AUTSA preempts the statutory claims. Finally, it challenges the individual claims on the merits.

### 1.    Reasonable Royalty

In *Gjerlov v. Schuyler Labs. Inc.*, 131 F.3d 1016, 1024 (Fed. Cir. 1997), a plaintiff brought claims for both infringement and breach of contract. A magistrate judge found liability only on the contract claims, but awarded damages based on 35 U.S.C. § 284, which compels a court to provide damages "in no event less than a reasonable royalty for the use made of the invention by the infringer." *Gjerlov*, 131 F.3d at 1024. Since the actual contract damages were less than the reasonable royalty damages would have been, the magistrate awarded the reasonable royalty damages instead. The Federal Circuit found that because the plaintiff had not shown that the defendant had infringed upon the patents, and because the contract covered issues other than infringement, it was improper for the district court to increase the award from the actual damages to a reasonable royalty amount. ("[R]eliance on *Interspiro* for the broad proposition that breach of a patent settlement agreement *requires* damages of not less than a reasonable royalty under 35 U.S.C. § 284 is misplaced."). *Gjerlov*, 131 F.3d at 1023 (emphasis added).

The state statutory claims do not specifically authorize a reasonable royalty based upon a hypothetical negotiation as a damage award. *Gjerlov* does not, however, prevent a damages calculation based on a reasonable royalty in contract or tort actions. It only prevents

a court from relying on a statutorily-set minimum damages award when the statute in question has not been violated. *Gjerlov*, 131 F.3d at 1023. In common-law claims, using a royalty calculation as a means of ascertaining actual damages can be appropriate. *Celeritas Tech., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed. Cir. 1998) ("Celeritas's damages may include that which Rockwell might have paid for use of the technology at the time of the breach in 1994 if it had chosen not to breach the contract."). *Gjerlov* cautions that awarding a reasonable royalty as a matter of course is not appropriate. Moreover, "[t]he law [ ] requires 'a reasonable basis in the evidence for the trier of fact to fix compensation when a dollar loss is claimed.'" *Universal Engraving, Inc. v. Metal Magic, Inc.*, CV-08-1944, 2010 WL 4922703, at *10 (D. Ariz. Nov. 29, 2010) (quoting *Short v. Riley*, 150 Ariz. 583, 586, 724 P.2d 1252, 1255 (App.1986). Nevertheless, should a jury find that Dr. Ugone's calculation of a reasonable royalty is compelling, it may rely on that calculation (in addition to or in conjunction with his other calculations, such as GID's projected loss of market share). Gore will not be granted summary judgment on the breach of contract, tort, and Chapter 93A claims based on the reasonable royalty measure of damages.

## 2. Pre-emption

The AUTSA "displaces conflicting tort, restitutionary and other laws of this state providing civil remedies for misappropriation of a trade secret" except for contract remedies and remedies for claims not based on misappropriation of a trade secret. A.R.S. § 44-407(A). Gore claims that the AUTSA preempts GID's Mass. Gen. Law 93A because it is a "claim premised on state law." (Doc. 119 at 10 n.5). The AUTSA limits preemption to the laws of "this state," namely Arizona; the claim brought under Massachusetts state law is not pre-empted.[2] The statute contains an exception for "Contractual remedies, whether or not based on misappropriation of a trade secret," so the Breach of Contract claim is not pre-empted.

---

[2] Neither is the claim pre-empted by Massachusetts law, since Massachusetts has not enacted a version of the U.T.S.A., but instead includes theft of trade secrets in its general larceny law. *See* Mass. Gen. Laws Ch. 266 § 30(4).

1  A.R.S. § 44-407(B)(1).

2      GID's Breach of Confidence, Unjust Enrichment, and Misrepresentation claims,

3  however, are pre-empted by A.R.S. § 44-407(A). GID argues that because a breach of

4  confidence claim "is grounded on an implied-in-law or quasi-contractual theory" it is not pre-

5  empted. (Doc. 122 at 16) (quoting *Berkla v. Corel Corp.* 302 F.3d 909, 918 (9th Cir. 2002)).

6  The AUTSA preemption clause does not contain an exception for claims grounded in quasi-

7  contractual theory; it contains an exception for "contractual remedies." A.R.S. § 44-407(B).

8  Although an unjust enrichment claim may also rest on quasi-contractual grounds, it is a

9  "form of restitutionary relief" and therefore pre-empted. *USLife Title Co. of Arizona v.*

10  *Gutkin*, 152 Ariz. 340, 354, 732 P.2d 579, 584 (App. 1986).

11      GID argues that if the allegedly misappropriated information were to eventually be

12  found not to be a trade secret, the preemption provision would not apply, and that preemption

13  is therefore premature. (Doc. 122 at 17). This argument was considered and rejected in

14  *Firetrace*. After acknowledging that the Arizona Supreme Court had not yet ruled on the

15  issue, the *Firetrace* court considered interpretations of versions of the UTSA from around

16  the country, and concluded that "the AUTSA preempts . . . common law tort claims based

17  on the misappropriation of information, whether or not that information meets the statutory

18  definition of a trade secret." 800 F. Supp. 2d at 1049.

19      The AUTSA preempts common law claims "to the extent they are based on an

20  allegation that Defendants misappropriated trade secrets." *Id.* at 1047. GID's breach of

21  confidence and unjust enrichment claims are based solely on allegations that Gore

22  misappropriated trade secrets. (Doc 72 ¶¶ 53, 59). They are wholly preempted. To the extent

23  that the misappropriation claim and the Chapter 93A claim allege acts other than

24  misappropriation of a trade secret, they are not preempted. (Doc. 72 ¶¶ 62–63, 66).

25      GID argues that because Gore did not raise the issue of preemption in its answer, the

26  defense is waived. (Doc. 122 at 15). Preemption in the AUTSA, however, is not properly

27  categorized as a defense—a claim that is preempted by statute "contain[s] no cause of action

28                                          - 16 -

that can proceed to trial." *Firetrace*, 800 F. Supp. 2d at 1050. Should it choose to abandon the AUTSA claim, the tort and restitutionary claims may proceed. Should it choose to pursue the AUTSA claim, the other claims are preempted as discussed above.

### 3.     Merits

Gore argues that the misappropriation claim is untimely and that it is barred by the parties' written agreements, and that the 93A claim fails because the acts in question did not take place in Massachusetts. These claims will be discussed in turn.

### a.     Misappropriation

The statute of limitations on a fraud claim is three years, and begins to run when the plaintiff "discovers or with reasonable diligence could have discovered the fraud." *Mister Donut of America, Inc. v. Harris,* 150 Ariz. 321, 323, 723 P. 2d 670, 672 (1986). Courts have indeed found that discoveries by a party can provide notice sufficient to trigger the running of a limitations period. In *Coronado Dev. Corp. v. Superior Court*, 139 Ariz. 350, 352, 678 P.2d 535, 538 (App. 1984), a couple purchased a property and was asked by the seller to amend the contract five years later. When they told a lawyer what had happened, the lawyer informed them "you have been had." *Id.* at 351. The court found that the statute of limitations began to run when the lawyer told the couple they had been deceived. *Id.* at 352. The district court has found that a person is on inquiry notice when a $3 million shipment of parts contains "mostly junk," because "any reasonable business person . . . would suspect fraud." *Aspect Sys., Inc. v. Lam Research Corp.*, CV-06-1620-NVW, 2008 WL 2705154, at *8 (D. Ariz. Jun. 26, 2008).

The misappropriation claim here is based on an alleged statement made by Dr. Bruce Steinhaus to representatives of GID that "Gore would not develop a device directly competitive with GI Dynamics's" and that "it would be contrary to Gore's corporate culture and ethics to do so." (Doc. 72 ¶ 32). Gore notes that GID's Chief Technology Officer, Andy Levine, noted in GID's management notes as early as May 1, 2006 that he was "concerned that Gore may look to see if they could do this without us." (Doc. 115-8, Ex. 40 at

GID0150413). When asked at his deposition as to the factual basis for his suspicion, Levine stated that "I can't give you a specific conversation, but there, were, there were discussions that we were involved with, I was involved with where I just had a feeling, and I guess I was right." (Doc. 120-3, Ex. 27 at 288:14–18). Gore does not argue that GID was on inquiry notice that Gore was developing its own device. Instead, it claims that the contents of the discussion Levine had with Gore representatives constituted actual notice that Dr. Steinhaus's assurances were not correct. (Doc. 119 at 11) ("These discussions were the 'facts' that caused GID to realize that the alleged misrepresentation was never true."). The contents of the actual conversation Levine had with Gore are not in the record, and therefore cannot be relied upon by this court at summary judgment. Whether GID had inquiry notice that Gore was developing its own sleeve, or actual notice that Gore's corporate culture did not discourage competing with customers, is a question for the jury.

Likewise, Gore's interpretations of the written agreements between the parties, which, if accepted, apparently contradict Dr. Steinhaus's alleged misrepresentations, are contested. Whether these phrases provide Gore the right to develop and market its own intestinal sleeve is one of the core contested issues in this lawsuit. Thus there are material issues of fact as to whether GID's reliance on Dr. Steinhaus's statements was inherently unreasonable based upon Gore's interpretation of these agreements. Summary judgment is denied on the misappropriation claim.

### b.    Chapter 93A

Massachusetts law offers a right of action against those who engage in unfair or deceptive business practices, so long as the practices "occurred primarily and substantially within the commonwealth." Mass. Gen. Laws Ch. 93A, § 11. When the question of whether the acts took place primarily or substantially within the Massachusetts is an issue in litigation, "the burden of proof shall be upon the person claiming that such transactions did not occur primarily and substantially within the commonwealth." *Id.*

GID claims that because Gore did not include the argument that the acts did not take

place "primarily and substantially" in its answer, it has waived the affirmative defense. (Doc.

76 ¶¶ 62–65). Ordinarily, "[f]ailure to raise an affirmative defense below results in waiver."

*Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996). The

"primarily and substantially" requirement, however, is not a typical  affirmative defense: it

neither "admit[s] the allegations of the complaint but suggest[s] some other reason why there

is no right of recovery," nor does it "concern allegations outside of the plaintiff's prima facie

case that the defendant therefore cannot raise by a simple denial in the answer." Wright &

Miller, Federal Practice and Procedure: Civil 3d § 1271. *Cf.*, *Satchell v. Dilworth*, 745 F.2d

781, 784–85 (2d Cir. 1984) (failure to plead qualified immunity in the answer waives

qualified immunity defense). Gore's denials were adequate to deny liability for the Ch. 93A

claim and will be "construed to do justice" so that the merits of its argument may be

addressed. FED. R. CIV. P. 8(e).

The  First Circuit employs a three-part test when the location issue is raised,

considering: "[1] [W]here the defendant committed the unfair acts or practices, . . .[2]

[W]here the plaintiff received and acted upon the deceptive or unfair statements, . . . [and]

[3] [T]he situs of plaintiff's losses due to the unfair or deceptive acts or practices." *Clinton*

*Hosp. Ass'n v. Corson Grp. Inc.*, 907 F.2d 1260, 1264–66 (1st Cir. 1990). Even construing

the facts in GID's favor, Gore committed most of the alleged acts in Flagstaff, Arizona,

particularly at presentations where GID employees visited Gore headquarters to meet with

their Gore counterparts. However, GID has also noted that Gore officials made frequent visits

to Massachusetts and called GID officials there. In evaluating where a defendant engaged in

unfair business practices, the First Circuit has found it relevant that "although the acts

originated in New York, it was intended that their force and input influence the plaintiff's

behavior in Massachusetts." *Clinton Hosp.*, 907 F.2d at 1264. Nevertheless, the first factor

weighs in favor of finding that the alleged acts did not take place primarily and substantially

in Massachusetts.

When viewing the facts in a light most favorable to GID, however, both of the other

1   factors weigh in favor of finding that the acts took place primarily and substantially in

2   Massachusetts. GID acted upon the allegedly deceitful practices of Gore in Massachusetts,

3   where it is headquartered and where it continued to research development of an intestinal

4   sleeve based in part on its interpretation of Gore's representations. Moreover, GID is based

5   in Massachusetts and suffered harm there. As the First Circuit has noted, "the place of injury

6   is not determinative," but it is nevertheless weighed alongside other factors. *Garshman Co.,*

7   *Ltd. v. General Electric Co.*, 176 F.3d 1, 7 (1st Cir. 1999) (affirming a district court's finding

8   that acts took place primarily and substantially outside of Massachusetts when 1) defendant

9   never came to Massachusetts at all, 2) most of the plaintiff's activities took place outside of

10   Massachusetts, and 3) the plaintiff was harmed in Massachusetts). A reasonable jury could

11   find that Gore has not met its burden of showing that the "center of gravity" of the allegedly

12   unfair practices was outside of Massachusetts. *Kenda Corp. v. Pot O'Gold Money Leagues,*

13   *Inc.*, 329 F.3d 216, 235 (1st Cir. 2003). Summary judgment will not be granted on the Ch.

14   93A claim.

15   **C.   Partial Summary Judgment on Individual Misappropriation Claims**

16   Misappropriation claims may be dismissed at summary judgment with regard to

17   individual trade secrets when there is no sufficient evidence to support a claim based on that

18   particular secret. *See Universal Engraving*, 2010 WL 4922703, at *6 (dismissing an

19   individual claim when undisputed facts demonstrated that defendant had discussed

20   purchasing a machine before hiring an employee whose knowledge regarding the machine

21   constituted the alleged trade secret). Conversely, when defendants "have not met their burden

22   of showing that no reasonable juror could conclude that the information constituted a trade

23   secret," summary judgment is not appropriate. *Id.* at *5. Gore moves that summary judgment

24   be granted on 1) certain trade secrets that have been "effectively withdrawn," 2) Trade Secret

25   1, because it is too vague to be enforced, 3) Trade Secret 2, because it was publicly disclosed,

26   and 4) Trade Secret 4, because it is not true. (Doc. 119 at 21–27). These issues will be

27   discussed in turn.

28

1

### 1.    "Effectively withdrawn" secrets

2    Gore contends that GID has effectively withdrawn two sets of secrets: one set which

3  was included in early versions of its response to interrogatories but was not included in its

4  October 27, 2011 "Restated Response to Interrogatory No. 1" (Doc. 115-1, Ex. 7), and one

5  set for which it offers no expert testimony. GID does not contest that its most recent response

6  to the interrogatory does not list 15 of the original 36 trade secrets, and therefore claims

7  regarding secrets number 8, 11, 12, 14–16, 18, 24–27, 29, 32, and 36 are dismissed.

8    Gore contends that "GID has admitted that it needs to rely on experts to establish . . .

9  whether and when the claimed secrets are published." (Doc. 119 at 22). Gore claims that the

10  failure of GID to provide expert testimony on the publication of the secrets requires dismissal

11  of those claims. (*Id.*). Gore cites to deposition testimony in which GID's Chief Financial

12  Officer, Robert Crane, stated that "there will be an expert who will render an opinion on

13  which trade secrets are in a particular article." (Doc. 120-3, Ex. 21 at 43:18–19). Gore further

14  cites to one of its statements of fact, namely that "GI Dynamics's [*sic*] will rely on its expert

15  witnesses as its source of evidence concerning the publication of trade secrets." (Doc. 120 ¶

16  46). In support of this statement of fact, however, Gore offered an interrogatory response of

17  GID which cites 42 published articles regarding the alleged trade secrets and says nothing

18  regarding reliance on expert testimony. (Doc. 120-1, Ex. 5 at 5–7). As Gore notes, moreover,

19  whether information is a trade secret depends not on whether it was published, but on whether

20  it "[d]erives independent economic value, actual or potential, from not being generally

21  known." A.R.S. § 44-401(4)(a). GID counters that for many of these alleged trade secrets, it

22  will not rely on expert testimony to demonstrate that the secrets derive independent economic

23  value from not being generally known, because the secrets in question are "non technical,

24  relating to business, regulatory and marketing plans." (Doc. 122 at 24). The Court has

25  examined the alleged trade secrets in question, and most of them relate to information

26  revealed by GID to Gore in presentations that were labeled as confidential. For these

27  secrets—numbers 13, 31, 33, 35, 37, 38, and 39—a reasonable jury could find that the secrets

28

derived independent economic value from not being generally known without expert testimony. Two of the secrets, however, are statements about the general parameters for inserting an intestinal sleeve, a project that both parties agree was of interest to the medical community long before 2006. None of the experts, all of whom produce specific detail on what aspects of anchoring an intestinal sleeve were generally known, claims that either Trade Secret 7 or Trade Secret 19 was not generally known.  Since it would be GID's burden at trial to show that these secrets were not generally known, and it has produced no evidence to support the contention, summary judgment is granted with regards to these two secrets. *Celotex*, 477 U.S. at 322.

### 2. Individual Secrets

#### a. Trade Secret No. 1

Gore claims that GID's first Trade Secret, namely that GID's device "is one that actually works," is too vague because experts disagree as to what criteria should be used to determine if a device "actually works." (Doc. 119 at 23). To prevail on a trade secrets claim, a plaintiff must "identify the trade secrets and carry the burden of showing they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (reversing grant of summary judgment in favor of plaintiff when plaintiff stated that its software contained trade secrets but did not "specify what these trade secrets are"). When a party fails to identify its trade secrets with particularity, summary judgment is appropriate. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1166 (9th Cir. 1998) (affirming summary judgment in favor of defendant when plaintiff failed to disclose particulars of alleged projection system but stated that the defendant had misappropriated "the manner of operation of the cam unit," "the manner in which the cam is lubricated," and similarly general statements). GID has provided expert reports on its device, multiple presentations that it gave to Gore regarding the safety and effectiveness of the device, and documentation regarding clinical studies of the device. Although there is some disagreement as to what level of scientific proof is required before one can properly say that a particular device "works," a reasonable jury could conclude from the

1   record that GID had defined Trade Secret No. 1 with particularity.

2   **b.     Trade Secret No. 2**

3   Gore argues that Trade Secret No. 2, namely that "the duodendum is an effective and
4   practicable place in the gastro-intestinal tract to anchor a mechanical medical device to treat
5   obesity," had been disclosed in a 2005 patent application. (Doc. 119 at 24–25). Disclosure of
6   a trade secret in a patent "places the information comprising the secret into the public domain"
7   and eliminates trade secret protection. *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 528
8   (N.D. Cal. 2000). The patent application in question states that anchoring in the duodendum
9   "offers several advantages" over other areas, that the duodendum "is naturally configured to
10  retain a suitably-shaped anchor," and that "the duodendal bulb 119 provides a better
11  anchoring platform" than other areas. (Doc. 119 at 25). GID counters that even after the patent
12  was filed, a number of Gore's outside physician-advisors warned that anchoring in the
13  duodendum was inadvisable because of safety concerns. The doctors stated that the
14  duodendum was "not forgiving at all" to the presence of metal, that it is "not a happy organ
15  to screw around with" and that putting a device there is "dangerous." (Doc. 122 at 27).
16  Neither the alleged trade secret itself nor the patent application speaks to whether anchoring
17  a device in the duodendum is safe or claims that the device addresses safety concerns
18  regarding the duodendum's fragility. The doctors' concerns, therefore, are outside the scope
19  of the trade secret or the information revealed in the patent. Trade Secret No. 2, as stated in
20  GID's responses to interrogatories, was disclosed in the 2005 patent application, and summary
21  judgment is granted on the claim regarding it.

22  **c.     Trade Secret No. 4**

23  Alleged Trade Secret No. 4 is that the GID device "is as affective as Roux-en-Y
24  surgery in treating type II diabetes." (Doc. 115-1, Ex. 2 ¶ 4). Gore claims that a dispute among
25  GID's experts regarding whether Trade Secret 4 is true requires summary judgment in its
26  favor. (Doc. 119 at 26). Although Dr. Jon Gould stated that he did not believe, at the time of
27  his deposition, that there was adequate evidence to show that the device was as effective in

28

1   treating diabetes as the surgery, (Doc. 115-3, Doc. 25 at 137:14), at least one other expert
2   disagreed. (*See* report of Leonard Pinchuk, Doc. 115-2 at 14). Gore's own expert wrote that
3   early tests demonstrated that "the intestinal sleeve device would have the same effect on
4   diabetes as Roux-en-Y surgery." (Doc. 123-8, Ex. 72 ¶ 95). There is a dispute among the
5   experts regarding Trade Secret No. 4, and therefore a genuine dispute of material fact that
6   prevents summary judgment in Gore's favor.

7                                    **CONCLUSION**

8        A reasonable jury could credit Dr. Ugone's report and conclude that GID was
9   damaged, or Gore unjustly enriched, by the misappropriation of trade secrets. The uncertainty
10  regarding the precise calculation of damages is best left to a jury. The reasonable royalty
11  calculation can also be an appropriate means for measuring damages in the common-law
12  claims, but may not be substituted as an alternate statutory minimum damage amount in those
13  claims. Except for the Breach of Contract claim and the claim under Massachusetts state law,
14  the non-AUTSA claims subject to this motion are pre-empted to the extent that they depend
15  upon the misappropriation of confidential information and GID elects to pursue its AUTSA
16  claim. Claims regarding the fifteen trade secrets that were not claimed in GID's Restated
17  Response to Interrogatories on October 27, 2011 are dismissed. Furthermore, GID has
18  presented no evidence that Trade Secrets 7 and 19 were not generally known, and claims
19  regarding those secrets are dismissed. Trade Secret 2 was disclosed in a patent application,
20  and the claim regarding it is therefore dismissed.

21       **IT IS THEREFORE ORDERED:**

22       1.      Gore's Motion for Summary Judgment, or in the alternative for Partial Summary
23  Judgment on Trade Secrets Misappropriation (Doc. 119) is **granted in part** and **denied in**
24  **part**.

25       2.      Should GID pursue its AUTSA claim, then the Breach of Confidence claim and
26  the Unjust Enrichment claim are preempted in their entirety, and the Misrepresentation claim
27  is preempted to the extent that it relies upon the misappropriation of confidential information.

28

1      3) Claims regarding Trade Secrets 2, 7, 8, 11, 12, 14–16, 18, 19, 24–27, 29, 32, and 36

2   are **dismissed.**

3      DATED this 29th day of May, 2012.

_A. Murray Snow_
_____
G. Murray Snow
United States District Judge